IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE GUND III, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PILATUS AIRCRAFT, LTD., et al.,<br><br>    Defendants.<br><br>AND ALL RELATED ACTIONS | NO. C07-4902 TEH<br>Related to NO. C08-3795 TEH<br><br><u>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>MOTION FOR SUMMARY<br>JUDGMENT</u> |

This matter came before the Court on March 8, 2010, on the motion for summary judgment or summary adjudication of Defendant Pratt & Whitney Canada Corp. ("P&WC"), regarding the applicability of the Death on the High Seas Act ("DOHSA") to this action. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

This action arises out of a plane crash in Costa Rica that killed the pilot and all five passengers. The Ruetz family – Donald, his wife Cynthia, and their children Tyler Donald ("Jack") and Raymond Justin ("Justin") – had moved from Manhattan Beach, California, to Playa Flamingo, Costa Rica, upon Donald's retirement. In July 2005, the Ruetzes hosted Paul Kells and his son Connor, former neighbors from Manhattan Beach, for a vacation in Costa Rica. For the last day of the Kells family's trip, Cynthia Ruetz booked an aerial sightseeing tour of Playa Flamingo Bay with pilot Gregory Gund on a Pilatus PC-6 Turbo

Porter, a small, single-engine aircraft owned by GG Aircraft LLC.[1] The plane took off on July 16, 2005, with Gund at the helm and five passengers on board: Cynthia, Jack, and Justin Ruetz, and Paul and Connor Kells. All six perished when the aircraft crashed off the shore of Costa Rica at approximately 9:25 a.m.

Two wrongful death actions were filed in San Francisco Superior Court on July 13, 2007. The first was brought by Gund's surviving relatives, his estate, and GG Aircraft LLC (the "Gund Plaintiffs") against the manufacturers of the plane, Pilatus Aircraft, Ltd. and Pilatus Business Aircraft, Ltd. (collectively, "Pilatus"), and the plane's turbo-prop engine, P&WC. The Gund Plaintiffs assert three causes of action for wrongful death and survival damages, as well as three more claims for property damages and indemnity, based on the loss of the airplane and settlement of the other victims' claims. Surviving members of the Kells and Ruetz families (the "Kells/Ruetz Plaintiffs") and the decedents' estates brought the second action, naming Pilatus, P&WC, and GG Aircraft LLC as defendants. They assert three claims for wrongful death and survival damages against Pilatus and P&WC,[2] as well as a fourth claim against GG Aircraft LLC.

P&WC removed the Gund Plaintiffs' case to federal district court on September 21, 2007, and removed the Kells/Ruetz action on August 7, 2008. The two matters were related on November 24, 2008. The Kells/Ruetz Plaintiffs settled with GG Aircraft LLC and the Gregory Gund estate, and all Plaintiffs dismissed Pilatus without prejudice.

P&WC moved for summary judgment or summary adjudication on January 4, 2010, arguing that Plaintiffs' claims are preempted by DOHSA, 46 U.S.C. § 30301 *et seq.*, and should therefore be dismissed. As an alternative to outright dismissal, P&WC asks the Court to find that DOHSA applies – but that DOHSA's expanded remedies for "commercial

---

[1] Gregory Gund was the sole member of GG Aircraft LLC, which was organized under the laws of Delaware and registered in California. The LLC was dissolved in 2008, its assets distributed to the Gund estate.

[2] The first three causes of action for wrongful death and survival damages in both complaints are broken down into claims for (1) negligence, (2) strict liability, and (3) breach of warranty.

2

1 aviation accidents" do not – and to reform the complaints accordingly. Plaintiffs opposed the
2 motion.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then "set out specific facts showing a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 250.

**DISCUSSION**

The Death on the High Seas Act, or DOHSA, provides the exclusive remedy for a wrongful death action based on an individual's death "occurring on the high seas beyond 3 nautical miles from the shore of the United States." 46 U.S.C. § 30302; *Offshore Logistics,*

*Inc. v. Tallentire*, 477 U.S. 207, 232 (1986); *see also Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 231 (finding that DOHSA applies where "an airplane crash occurs on the high seas"). Such an action, brought by "the personal representative of the decedent," "shall be for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative," for whom recovery is limited to "fair compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought." 46 U.S.C. §§ 30302, 30303. "Loss of support, services, and inheritance are pecuniary damages available under DOHSA." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1350 (9th Cir. 1987). The statute also allows for *nonpecuniary* damages – which include "damages for loss of care, comfort, and companionship" – where "the death resulted from a *commercial aviation accident* occurring on the high seas beyond 12 nautical miles from the shore of the United States." 46 U.S.C. § 30307 (emphasis added). If the law of a foreign country provides a cause of action for wrongful death, DOHSA permits the bringing of a civil action in admiralty based on the foreign claim "in a court of the United States." *Id.* § 30306.

Assuming DOHSA governs these lawsuits, the broad question raised by P&WC's motion is the availability of remedies. P&WC argues that only pecuniary damages can be recovered, whereas Plaintiffs assert that additional remedies are made available by two provisions of DOHSA. The Kells/Ruetz Plaintiffs argue that the crash constituted a "commercial aviation accident," and therefore qualifies for the nonpecuniary damages made available by section 30307. The Gund Plaintiffs urge the Court to apply – pursuant to section 30306 – the law of Costa Rica, which they contend allows recovery for economic loss and moral damages. The Court will begin by determining whether DOHSA applies here and, if it does, will then address the availability of remedies beyond pecuniary damages.

**I.     The Applicability of DOHSA.**

It is undisputed that the plane crashed within the territorial waters of Costa Rica, more than three nautical miles from the shore of the United States. P&WC moves the Court to conclude that the crash occurred on "the high seas" for purposes of DOHSA, and that the

4

statute therefore provides the exclusive remedy here. Such a conclusion is mandated by *Howard v. Crystal Cruises, Inc.*, in which the Ninth Circuit held that "something that happens within the territorial waters of a foreign state occurs on the 'high seas' for purposes of DOHSA." 41 F.3d 527, 529, 530 (9th Cir. 1994). Plaintiffs, while acknowledging this Court's obligation to follow *Howard*, contend that the "high seas" do *not* encompass a foreign state's territorial waters, and reserve their right to challenge *Howard* on appeal. Pursuant to *Howard*, this Court concludes that the crash at issue here occurred on the "high seas," and that DOHSA applies.

This conclusion does not require, as P&WC urges, the dismissal of both complaints. In passing DOHSA, Congress "creat[ed] a *remedy* in admiralty for wrongful deaths more than three miles from shore." *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 620 (1978) (emphasis added). Plaintiffs' claims for negligence, strict liability, and breach of warranty are not inconsistent with DOHSA, which explicitly applies when "the death of an individual is caused by wrongful act, neglect, or default." 46 U.S.C. § 30302; *see also, e.g., Friel v. Cessna Aircraft Co.*, 751 F.2d 1037, 1038 (9th Cir. 1985) (addressing claims for negligence, strict tort, and breach of warranty under DOHSA). In light of DOHSA's preemption of "[s]tate and general maritime law wrongful death actions" for deaths on the high seas, Plaintiffs "cannot state a claim for relief for wrongful death other than in accordance with DOHSA." *Favaloro v. S/S Golden Gate*, 687 F. Supp. 475, 478 (N.D. Cal. 1987). The Court must therefore examine whether Plaintiffs' claims are stated *in accordance with* DOHSA.

## II. Remedies Available Under DOHSA

DOHSA "does not address every issue of wrongful-death law," but it does announce "Congress' considered judgment on such issues as the beneficiaries, the limitations period, contributory negligence, survival, and damages." *Higginbotham*, 436 U.S. at 625. P&WC therefore asks the Court, as an alternative to dismissal, to limit Plaintiffs' remedies to pecuniary damages, which is all that DOHSA allows for incidents that are not commercial aviation accidents. Plaintiffs contend that additional remedies are available under two

5

theories: first, that the incident was a "commercial aviation accident" under DOHSA, and second, that the law of Costa Rica should be applied.

**A.     DOHSA's provision for a "commercial aviation accident."**

DOHSA allows for recovery of both pecuniary and nonpecuniary damages in the case of a "commercial aviation accident occurring on the high seas beyond 12 nautical miles from the shore of the United States." 46 U.S.C. § 30307. Whether or not the incident here qualifies as such an accident is vigorously contested by the parties.[3] The statute never defines "commercial aviation accident," which was added to DOHSA in 2000 as part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), Pub. L. 106-181, 114 Stat. 61 (2000). The amendment followed a string of aviation disasters off the northeast coast of the United States – TWA Flight 800, Swissair Flight 111, and EgyptAir 990 – and was intended to ameliorate DOHSA's limitation on the damages available for surviving family members. *See* 145 Cong. Rec. S15078 (daily ed. Nov. 19, 1999) (statement of Sen. Specter).

P&WC argues that the flight at issue here was not commercial, but rather a "private, sightseeing flight." Def.'s Mot. for Summ. J. (Doc. 44), at 8. It claims that the "plain meaning of the phrase 'commercial aviation accident' utilized by Congress in the amended DOHSA statute is a direct reference to commercial airline mass disasters involving transport category aircraft with fare-paying passengers." Def.'s Reply (Doc. 59), at 7. Plaintiffs, relying largely on the Federal Aviation Regulations ("FAR"), insist that the flight was commercial because the passengers paid the pilot for a trip that he would not otherwise have taken.

Donald Ruetz, in his declaration, explained how the arrangements for the flight were made. His wife, Cynthia, telephoned Gregory Gund the evening before the accident, after he had been recommended by a personal trainer at the gymnasium the Ruetzes owned. Neither

---

[3] That the accident occurred "beyond 12 nautical miles from the shore of the United States" is undisputed.

6

Donald nor Cynthia had met Gund before. After observing her telephone conversation, Donald gave Cynthia $160 from his wallet, which was the amount she told him she needed to pay for the flight.[4] Although Gregory Gund had obtained a special permit to fly in Costa Rica, he was not authorized to conduct any commercial flights there. He did have a commercial pilot's license in the United States.

Very few cases have interpreted the meaning of "commercial aviation accident" under DOHSA. Both sides rely on two district court cases from other jurisdictions, *Brown v. Eurocopter S.A.*, 111 F. Supp. 2d 859 (S.D. Tex. 2000), and *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1369 (S.D. Fla. 2009), that grappled with the definition of "commercial aviation accident." *Brown* dealt with the crash of a helicopter that was ferrying two platform workers from one fixed oil platform to another as part of an "on-demand" air taxi service in the Gulf of Mexico. The *Brown* court relied on dictionary definitions and the FAR to conclude that the helicopter crash was a "commercial aviation accident." "'Commercial activities' is defined as 'any type of business or activity which is carried on for a profit,'" *Brown*, 111 F. Supp. 2d at 862 (quoting Black's Law Dictionary 270 (6th ed. 1990)), and "'aviation' is defined as 'the operation of heavier-than-air aircraft,'" *id.* (quoting Webster's Ninth New Collegiate Dictionary 119 (1990)). Those definitions alone were sufficient for the court to find that the flight at issue – part of an "on-demand air taxi service using heavier-than-air helicopters" – constituted a "commercial aviation accident." *Id.*

---

[4] P&WC objects to the admissibility of Donald Ruetz's declaration regarding his wife's conversation with Gregory Gund, which it asserts is hearsay. Material presented on summary judgment must be admissible under the rules of evidence. Fed. R. Civ. P. 56(e); *see In re Sunset Bay Assoc.*, 944 F.2d 1503, 1514 (9th Cir. 1991). Cynthia Ruetz's statement that she needed $160 to pay for the flight is a statement of the declarant's intent under Federal Rule of Evidence 803(3), and is admissible to prove that she did pay $160 for the flight. *See United States v. Pheaster,* 544 F.2d 353, 376 (9th Cir. 1976) (under "*Hillmon* doctrine," a hearsay declarant's statement of intent to do something may be used inferentially to prove that she did it). Donald Ruetz's testimony that he gave $160 to his wife is not hearsay and is admissible. Plaintiffs' evidence is sufficient to establish that $160 was charged for the flight, a material fact that P&WC has failed to rebut or otherwise put in genuine dispute.

7

To buttress that conclusion, the *Brown* court turned to regulations,[5] presuming "that if Congress does not see fit to provide an express definition of ordinary terms, Congress intends for the undefined statutory language to have a meaning consistent with the background federal regulations already in place which govern the subject matter at issue." *Brown*, 111 F. Supp. 2d at 863. "Commercial operator" is defined as "a person who, for compensation or hire, engages in air commerce of persons or property." *Id.* (quoting 14 C.F.R. § 1.1).[6] Reviewing the regulations for "commuter or on-demand operations," codified at Part 135 of Title 14 of the Code of Federal Regulations, the court found that a "Part 135 on-demand air taxi service is plainly a 'commercial operation' as that term is used throughout the FAR," and that the helicopter crash therefore constituted a "commercial aviation accident." *Id.* at 864.

At issue in *Eberli* was whether the crash of an aircraft being ferried for delivery to its purchaser constituted a "commercial aviation accident." The court found that it did not, because operating instructions attached to the aircraft's certificate of airworthiness – which "was obtained specifically for the purpose of ferrying" the aircraft – prohibited it from being operated "for carrying passengers or property for compensation or hire." *Eberli*, 615 F. Supp. 2d at 1373. Noting that "commercial purposes" is defined in the transportation code as "the transportation of persons or property for compensation or hire," *id.* (quoting 49 U.S.C. § 40125), the court concluded that ferrying the aircraft could not by definition be commercial.

"When dealing with a matter of statutory interpretation, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *Retuta v. Holder*, 591 F.3d 1181, 1188 (9th Cir.

---

[5] The *Brown* court concluded that, since "AIR 21 is largely concerned with reauthorizing programs of the Federal Aviation Administration, the Court naturally looks to the Federal Aviation Regulations ('FAR'), codified in Title 14 of the Code of Federal Regulations." *Brown*, 111 F. Supp. 2d at 863.

[6] "Air commerce" means "interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any Federal airway or any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce." *Brown*, 111 F. Supp. 2d at 863 (quoting 14 C.F.R. § 1.1).

8

2010) (internal citations and quotation marks omitted). The plain meaning of the statutory text – and the definitions in the regulations – clearly demonstrate that a flight's "commercial" character hinges on profit or compensation. "Commercial" describes anything "made, done, or operating primarily for profit." Webster's New World Dictionary 280 (1991). Under the FAR, a flight that carries passengers for compensation is commercial. *See* 14 C.F.R. § 1.1 (defining "commercial operator" as "a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property"). Although a private pilot may transport passengers where the pilot does "not pay less than the pro rata share of the operating expenses," 14 C.F.R. § 61.113(c), such a flight is still considered commercial if the pilot and his passengers do not share "a bona fide common purpose for conducting the flight." Federal Aviation Administration Legal Interpretation on 14 C.F.R. § 61.113(c) to Don Bobertz, from Rebecca B. MacPherson, Assistant Chief Counsel for Regulations (May 18, 2009).

P&WC relies heavily on the legislative history of AIR 21, the bill that added the "commercial aviation accident" provision to DOHSA, to argue that Congress intended to limit its application to mass airline disasters involving transport category aircraft and fare-paying passengers, as a series of such disasters had prompted the bill's introduction. However, this Court agrees with the *Brown* court's observation that, while the "legislative history clearly reveals an intention to include within the definition accidents involving regularly scheduled, international flights (such as TWA 800), . . . there is nothing to suggest a desire to restrict the definition beyond what is already implied by the adjectives 'commercial' and 'aviation.'" *Brown*, 111 F. Supp. 2d at 863. Furthermore, where a question of statutory interpretation is resolved "by examining the plain language of the statute, its structure, and purpose, our 'judicial inquiry is complete,' and we need not consult a statute's legislative history." *United States v. 475 Martin Lane*, 545 F.3d 1134, 1143 (9th Cir. 2008) (quoting *Campbell v. Allied Van Lines, Inc.*, 410 F.3d 618, 622 (9th Cir. 2005)). There is no need to reach legislative history given the clear meaning of "commercial aviation accident."

Gregory Gund charged $160 for the sightseeing excursion. There is no evidence that

9

the $160 paid by Cynthia Ruetz was meant only to cover the passengers' pro-rata share of operating expenses. Even if the passengers were merely reimbursing Gund, no evidence suggests that the pilot and passengers shared a "bona fide common purpose" for the flight: the passengers boarded the flight for a tour, and Gund's purpose was to transport them. Although Gund was not authorized to conduct a commercial flight in Costa Rica, the pilot's proper credentialing does not dictate the commercial character of a flight; otherwise, even a mass airliner's commercial character could be stripped away if its pilot were unlicensed, a result Congress would never have intended. Finally, both *Brown* and *Eberli* support the conclusion that Gund's flight was commercial: the flight in *Brown* was commercial because it was conducted for profit or compensation; that in *Eberli* was not because ferrying an airplane was expressly characterized as a non-commercial activity.

Because the passengers paid for the flight and the passengers and pilot did not share a bona fide common purpose, the crash at issue here constituted a "commercial aviation accident" under DOHSA. Both pecuniary and nonpecuniary damages are therefore available to Plaintiffs.

**B.     The application of Costa Rican law.**

Relying on section 30306 – under which actions based on foreign law may be brought in U.S. courts – the Gund Plaintiffs demand that the law of Costa Rica be applied here, which they assert would allow the recovery of economic and moral damages. A court is to apply "normal choice-of-law principles" to determine whether U.S. law or foreign law "governs an action" under DOHSA. *Dooley v. Korean Air Lines Co.*, 117 F.3d 1477, 1485 (D.C. Cir. 1997). The Supreme Court established a choice-of-law analysis for maritime actions in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), which the parties agree is the appropriate standard for determining what law to apply. *See Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959) ("The broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime

law generally."); *see also In re Air Crash Disaster Near Bombay, India*, 531 F. Supp. 1175, 1188 (W.D. Wash. 1982) (applying *Lauritzen* to choice of law question under DOHSA).

*Lauritzen* lists seven factors that, "alone or in combination, are generally conceded to influence choice of law to govern . . . a maritime tort claim": (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of the foreign forum; and (7) the law of the forum. 345 U.S. at 582-92; *see also Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) (enumerating *Lauritzen* factors). An eighth factor, "the shipowner's base of operations," was added by *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970). "The question to be answered by reference to these factors is a simple one: are the United States's interests sufficiently implicated to warrant the application of United States law?" *Warn v. M/Y Maridome*, 169 F.3d 625, 628 (9th Cir. 1999). "The purpose of the analysis is to balance the interests of the nations whose law might apply." *Bilyk v. Vessel Nair*, 754 F.2d 1541, 1543 (9th Cir. 1985).

The *Lauritzen* test "is not a mechanical one," and its elements do not carry equal weight: "the flag that a ship flies may, at times, alone be sufficient." *Rhoditis*, 398 U.S. at 308. *Lauritzen* "firmly mandates that the law of the flag presumptively controls, unless other factors point decidedly in a different direction." *Bilyk*, 754 F.2d at 1545. "[C]ourts should weigh and evaluate all relevant points of contact between the transaction and the sovereign legal systems that are affected by it, and not simply run through a mechanical analysis of the *Lauritzen* factors." *Trans-Tec Asia*, 518 F.3d at 1124. Applying the facts to the *Lauritzen* elements, the Court finds that the choice-of-law analysis strongly favors U.S. law above that of Costa Rica:

(1) The wrongful act – the crash of the airplane into the sea – occurred in Costa Rica's territorial waters. "The locus of a tort is the place where injury takes effect." *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 256 (9th Cir. 1973).

(2) The plane was registered with the U.S. Federal Aviation Administration, No. N908PL, and its registered owner was GG Aircraft LLC, which was organized under

11

Delaware law and registered in California. The plane therefore carried the flag of the United States. Although the Gund Plaintiffs point out that the plane "was operating under Costa Rican flight rules," and "was owned through the single-member LLC by Gregory Gund, a Costa Rica domiciliary," Gund Pls.' Opp'n (Doc. 55) at 9, such details do not alter the country whose flag is flown. A ship "is deemed to be a part of the territory of that sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty." *Lauritzen*, 345 U.S. at 585.

(3) All six of the injured parties were citizens of the United States. Two, Paul and Connor Kells, resided in the U.S. at the time of the crash. The other four – the Ruetz family and Gregory Gund – resided in Costa Rica and owned homes there.

(4) The shipowner, GG Aircraft LLC, was based in the United States; its only member, deceased pilot Gregory Gund, was a U.S. citizen residing in Costa Rica.

(5) The parties agree that the "place of the contract" "has no literal application" to these facts. *In re Air Crash Disaster Near Bombay, India*, 531 F. Supp. at 1190. However, arrangements for the flight were made in Costa Rica.

(6) According to the Gund Plaintiffs' expert in Costa Rica law, Manrique Lara-Bolanos, the foreign forum would be available to hear these claims.

(7) The forum is the United States. However, "the law of the forum is largely irrelevant" in the choice-of-law analysis. *Warn*, 169 F.3d at 628 n.2.

(8) The shipowner, GG Aircraft LLC, was organized under Delaware law and registered in California, but its only member – Gregory Gund – operated out of Costa Rica.

Only the first factor – the location of the crash – would clearly favor Costa Rica. The rest of the factors either support the application of U.S. law, or are mixed or irrelevant. Although some of the injured parties were domiciled in Costa Rica, all were citizens of the United States, where the airplane – and the corporation that owned it – were registered. Plaintiffs chose to bring this action in a court in the United States, despite the availability of a forum in Costa Rica. Finally, the most important factor – law of the flag – favors the United States. In other words, the interests of the United States are "sufficiently implicated to

warrant the application of United States law." *Warn*, 169 F.3d at 628. The correct law to be applied to this action is that of the United States. Costa Rican law, and its remedies, are not available to Plaintiffs.[7]

**III.    Additional Matters**

P&WC further argues that the estates of the six decedents are not proper plaintiffs in this action, as DOHSA permits only an action "for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative." 46 U.S.C. § 30302. Plaintiffs, addressing this argument at hearing, clarified that the actions were filed by representatives of the decedents' estates, but that no recovery is sought by the estates themselves. The Court therefore will not dismiss the estates, as P&WC requests, because the parties agree that recovery is limited to those individuals identified in section 30302. P&WC also argued at hearing that some Plaintiffs are not a "spouse, parent, child, or dependent relative" of a decedent, and should therefore be dismissed. However, this issue was not raised on Plaintiff's motion, and the Court has no basis for evaluating each Plaintiff's compliance with section 30302.

Finally, the Gund Plaintiffs point out that P&WC did not move to dismiss its fourth, fifth, or sixth causes of action, for property damage and indemnity based on the loss of the aircraft and the settlements of claims with the other parties. The Gund Plaintiffs argue that those claims are not subject to the limitations imposed by DOHSA, which covers only wrongful death actions. At hearing, P&WC conceded that the claims for property damage survive its motion, but argued that indemnity claims cannot proceed because they represent an indirect avenue to obtain remedies that DOHSA directly precludes. Again, however, since P&WC did not move to dismiss those claims, they survive summary judgment.

---

[7] P&WC also argued that Plaintiffs' notice of foreign law was improper under Federal Rule of Civil Procedure 44.1. Since the Court concludes that Costa Rican law is anyhow inapplicable, it is unnecessary to address the procedural argument.

13

**CONCLUSION**

The motion is GRANTED IN PART and DENIED IN PART. The Court finds that DOHSA and its provisions regarding "commercial aviation accidents" apply here, and that both pecuniary and nonpecuniary damages are available; Costa Rican law will not govern this action. Therefore, only pecuniary and nonpecuniary damages, as defined in the context of DOHSA, may be recoverable for the wrongful death causes of action. All of Plaintiffs' claims otherwise survive summary judgment.

**IT IS SO ORDERED.**

Dated: 3/11/10

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT